UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

REBEKAH E. NORGREN,

          Plaintiff,               Case No. 2:14-cv-12417
                                           Judge Sean F. Cox
v.                                    Magistrate Judge Anthony P. Patti

COMMISSIONER OF
SOCIAL SECURITY,

          Defendant.
_____/

## RECOMMENDATION TO DENY PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT (DE 11) AND TO GRANT DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (DE 13)

**I.**     **RECOMMENDATION**: For the reasons that follow, it is

**RECOMMENDED** that the Court DENY Plaintiff's motion for summary

judgment, GRANT Defendant's motion for summary judgment, and AFFIRM the

Commissioner's decision.

**II.**     **REPORT**

      Plaintiff, Rebekah E. Norgren, brings this action under 42 U.S.C. §§ 405(g)

and 1383(c)(3) for review of a final decision of the Commissioner of Social

Security  ("Commissioner") denying her applications for disability insurance (DI)

and supplemental security income (SSI) benefits.  This matter is before the United

States Magistrate Judge for a Report and Recommendation on Plaintiff's motion

1

for summary judgment (DE 11), the Commissioner's cross motion for summary

judgment (DE 13), Plaintiff's answer (DE 14) and the administrative record (DE

6).

### A.    Background

Plaintiff filed her applications for DI and SSI benefits during October 2011,

alleging that she has been disabled since August 4, 2010, at age 33.  R 178-186,

187-194.  Plaintiff alleges disability as a result of bipolar disorder,[1] anxiety

disorder,[2] C5-6 disc herniation status post laminectomy & fusion surgery, cervical

radiculopathy to right arm & hand, chronic nausea, low back pain, and thoracic

spine pain across shoulders.  R. at 210-224.  Plaintiff's applications were denied on

November 9, 2011.  R. at 55-67, 68-80, 81, 82.

---

[1] Bipolar disorder is "an affective disorder characterized by the occurrence of alternating manic, hypomanic, or mixed episodes and with major depresive episodes. The DSM specifies the commonly observed patterns of bipolar I and bipolar II disorder and cyclothymia."  Stedmans Medical Dictionary 259770 (Nov. 2014).

[2] Anxiety disorders are "a group of disorders involving various manifestations of anxiety that are grouped together nosologically in the DSM. These include panic disorder (see also *panic attack*), specific phobia, formerly simple phobia (see *phobia*); social phobia that was formerly called social anxiety disorder; obsessive-compulsive disorder (OCD); (see also *obsession*, *compulsion*, *obsessive-compulsive*); posttraumatic stress disorder (PTSD); acute stress disorder; generalized anxiety disorder (GAD); and anxiety disorders secondary to medical conditions or substance-induced or not otherwise specified."  Stedmans Medical Dictionary 259650 (Nov. 2014).

Plaintiff sought a *de novo* hearing before an Administrative Law Judge ("ALJ").  R. at 106-108.  ALJ Henry Perez, Jr. held a hearing on January 22, 2013, at which Plaintiff was represented by counsel and Vocational Expert (VE) Helen Topcik testified.  R. at 26-46.  On January 31, 2013, ALJ Perez determined that Plaintiff was not disabled within the meaning of the Social Security Act.  R. at 8-25.

On April 4, 2013, Plaintiff requested review of the hearing decision.  R. at 7.  On April 19, 2014, the Appeals Council denied Plaintiff's request for review.  R. at 1-6.  Thus, ALJ Perez's decision became the Commissioner's final decision.

Plaintiff then timely commenced the instant action on June 20, 2014.  DE 1.

### B.   Plaintiff's Medical History

In this case, Plaintiff alleges that she has been disabled since August 4, 2010.  *See* R. at 180, 187.  Plaintiff's medical records span the period from May 9, 2009 to December 18, 2012.  R. at 252-782 (Exhibits 1F-26F).

#### 1.   Orthopedic History

Of particular import here are the records of Frederick S. Junn, M.D., Plaintiff's treating physician.  On June 6, 2010, Dr. Junn diagnosed Plaintiff with intractable neck pain with C6 radiculopathy on the right and hyperemesis gravidarum.  Dr. Junn also noted that an MRI revealed a C5-C6 lesion paracentral to the right in the epidural space, which may be disk versus schwannoma, and was

less likely to be blood or abscess.  Dr. Junn ordered an MRI and planned for
surgical intervention.  R. at 276-278.

On June 9, 2010, Dr. Junn performed an anterior cervical discectomy at C5-
6.  R. at 274-275.  She had a postoperative visit on July 22, 2010, at which time her
symptoms had improved "with an improvement in her right upper extremity
weakness, numbness and radicular pain."  Notes from that visit indicate that "most
of her pain is located in the scapular region bilaterally and will radiate down to the
mid thoracic region."  R. at 271-272.

On November 4, 2011, Plaintiff complained of neck pain, "mostly on the
right side that radiates into the [right upper extremity] with [numbness/tingling]
and weakness[,]" and her pain was a 4/10.  Dr. Junn prescribed physical therapy, 3
times per week for 4 to 6 weeks.  R at 727.

On July 12, 2012, Plaintiff presented with constant pain in her right arm.
Dr. Junn prescribed Neurontin.  R. at 726.  On August 20, 2012, Plaintiff
underwent a cervical myelogram, which revealed (1) post-surgical changes with
fusion hardware at C5-C6 without CT evidence of hardware loosening; and (2) re-
demonstration of a small central, posterior disc protrusion at C6-C7 without
significant spinal canal stenosis.  R. at 763-764, 765.

On November 1, 2012, Dr. Junn completed a State of Michigan Family
Independence Agency Medical Examination Report.  Here, Dr. Junn noted that

4

Plaintiff could occasionally lift/carry up to 10 pounds, but could not lift/carry 20 or more pounds.  R. at 761-762.

On December 18, 2012, Plaintiff complained of neck pain and rated her pain an 8/10.  Dr. Junn diagnosed degeneration of cervical intervertebral disc and other nerve root and plexus disorders.  Dr. Junn prescribed physical therapy, 3 times a week for 4 to 6 weeks.  R. at 759-760.

### 2.    Psychiatric History

Plaintiff reports having suffered what can only be described as heartrending and severe abuse as a child.  (*See* R. at 265, 416).  The record reveals several diagnoses of mood disorder[3] and bipolar disorder.  For example, on May 9, 2009, psychiatrist Babu R. Vadlamudi, M.D. diagnosed Plaintiff with bipolar affective disorder[4] depressed type, assessed a GAF score of 15 and determined that Plaintiff needed acute psychiatric inpatient treatment.  (R. at 261-262.)  At a January 25, 2011 office visit with Jessica Haveman, M.D., Plaintiff was assessed with mood disorder and started on Seroquel and Wellbutrin.  (R. at 592-594.)  On February 8,

---

[3] Mood disorders are "a group of mental disorders involving a disturbance of mood, accompanied by either a full or partial manic or depressive syndrome that is not due to any other mental disorder. Mood refers to a prolonged emotion that colors the whole psychic life; it generally involves either depression or elation; *e.g.,* manic episode, major depressive episode, bipolar disorders, and depressive disorder (see separate entries for each)."  Stedmans Medical Dictionary 260260 (Nov. 2014).

[4] Affective disorders are "a group of mental disorders characterized by a mood disturbance."  Stedmans Medical Dictionary 259620 (Nov. 2014).

2011, therapist Betty Rickman diagnosed Plaintiff with bipolar disorder.  (R. at 419.)[5]  Dr. Haveman again assessed Plaintiff with mood disorder on February 24, 2011; she was to continue Wellbutrin but was not taking Seroquel.  (R. at 595-597).  Notes from a March 21, 2011 consultation/initial psych evaluation with Michelle Fontenelle-Gilmer, M.D. diagnose Plaintiff with "Bipolar, Manic", indicate that Plaintiff's prescription for Wellbutrin would continue to be on hold and that Plaintiff would stop Seroquel, and prescribe Geodon.  (R. at 598-600.)  On April 7, 2011, Dr. Haveman assessed Plaintiff with "Bipolar disorder, unspecified"; although apparently experiencing diarrhea from the Geodon, Plaintiff was to continue taking it for two weeks, after which the prescription would be reassessed.  (R. at 601-603.)

On November 29, 2011, therapist Rickman assessed Plaintiff with bipolar affective disorder unspecified and a GAF score of 55.  (R. at 686.)  Plaintiff attended Life Practice, L.L.C. several times from November 29, 2011 through October 29, 2012.  (R. at 757; *see also*, R. at 686-700, 758.).

C.    **Hearing Testimony (January 22, 2013)**

1.    **Plaintiff's Testimony**

---

[5] Plaintiff treated at Hope Network Insight during February, April and June 2011. (R. at 415-424).

Plaintiff Rebekah Elizabeth Norgren testified at the January 22, 2013 hearing.  R. at 29-41.  Plaintiff lives with her husband and four children.  She has an Associate's Degree, a medical assisting certification, and took a course in phlebotomy.  R. at 29.  In the past, she has worked as a sales associate at Hot Topic, in the meat department at Whole Foods, as a secretary, and at an industrial strength container heater company.  R. at 30-31.

When Plaintiff was healthier and working, she weighed about 170-175 pounds.  R. at 30.  At the time of the hearing, Plaintiff weighed 200 pounds.  R. at 29.  Plaintiff attributes her increase in weight to being unable to "do anything."  R. at 30.

Plaintiff testified that she stopped working on August 4, 2010, due to a June 2010 cervical spinal fusion.  R. at 31.  She went back to work two or three weeks after having the surgery, but after two or three weeks of working she had to stop.  R. at 31-32.  She could not do any of the work, as it was very painful in her back, neck, arm and hand.  R. at 32.

Plaintiff describes the pain in her neck as "crunching" and "burning."  R. at 34.  She describes the pain in her arm as "often a burning and tingling or a numb pain and that also goes down into my hand and my fingers[,]" on the right side.  R. at 34-35.  This pain is almost always constant.  R. at 35.

7

For pain, Plaintiff takes hydrocodone (Norco) and perhaps Tylenol. She has a heating pad. Also, she uses Gabapentin as a nerve medicine and for her depression. R. at 35. She gets debilitating headaches from her neck pain two or three times per week. Often times, she will have to lie down. Sometimes the headaches last a couple of hours, sometimes an entire day. The headaches can make Plaintiff throw up. R. at 36.

In addition to treating her neck pain with surgery and medication, Plaintiff stated that she has undergone three rounds of physical therapy, which helped a little bit. Every day, she uses a heating pad. R. at 37. During the day, she is usually on her bed, which has a "big, squishy mattress topper[,]" because "[e]verything else is kind of hard and painful." R. at 37-38. Plaintiff is able to sit for about 10 or 15 minutes, stand for 5 or 10 minutes, and walk about one half of a block. R. at 38. She can lift and carry about a half gallon. She does not drive very much, because she cannot turn her head and is anxious. R. at 39.[6]

She spends her days at home. R. at 39. She does not really read anymore, because she is easily distracted. She watches more television than anything, but her mind "goes bad places when [she watches] TV." She can fold laundry and sometimes dusts or wipes down the table. R. at 40. She cannot do the other

---

[6] In her function report, she indicates that she goes out "[a]bout 4 to 5 times a week[,]" either driving or as a passenger in a car. (R. at 228.).

chores, because "[t]hings are heavy, difficult, or require motions that I can't do with my hand because I'm right-handed and I can't use it hard."  R. at 40-41.[7]

Plaintiff testified about psychological matters, including depression, sadness, anxiety, "racing thoughts," "trouble concentrating," "suicidal ideologies," nervousness, lack of motivation, and crying.  R. at 32-34.  Plaintiff has been in therapy since she was 11 years old.  (R. at 32.).

### 2.    Vocational Expert Testimony

The VE also testified.  R. at 41-46.  She was asked to assume an individual of Plaintiff's age, education and work experience, with the following limitations: lifting 20 pounds occasionally, 10 pounds frequently; sitting/standing/walking six hours; occasional handling with the right upper extremity; occasionally climbing, balancing, stooping, crouching, kneeling, and crawling; occasional, brief contact with the public; and jobs where an individual could carry out tasks that have one to two step instructions and do not require prolonged periods of sustained concentration, putting the individual at the unskilled level.  R. at 43.

The VE testified that such a person could not perform Plaintiff's past relevant work.  R. at 43.  However, such a person could perform the occupations of

---

[7] In her function report, she also mentions taking care of her baby, overseeing her older children's homework and bed times, preparing quick and easy meals one to three times per day, folding laundry multiple times per week and dusting biweekly. (R. at 226-227.).

night patrol inspector, with 3,000 in the Detroit area; inspector, with 3,000 in the

Detroit area; and sorter, with 3,500 in the Detroit area.  R. at 43-44.[8]

### D.    The Administrative Decision[9]

ALJ Perez rendered his decision on January 31, 2013.  R. at 8-25.  At Step 1,

the ALJ found that Plaintiff has not engaged in substantial gainful activity since

August 4, 2010, the alleged onset date.  R. at 13.

---

[8] The VE also testified as to hypotheticals where Plaintiff's testimony was found credible, and exertional limitations and non-exertional limitations were taken into consideration.  R. at 44-45.

[9] Social Security Regulations require ALJs to resolve a disability claim through a five-step sequential evaluation of the evidence.  *See* 20 C.F.R. §404.1520(a)(4). Although a dispositive finding at any step terminates the ALJ's review, *see Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), if fully considered, the sequential review considers and answers five questions:

1.    Is the claimant engaged in substantial gainful activity?
2.    Does the claimant suffer from one or more severe impairments?
3.    Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1?
4.    Considering the claimant's residual functional capacity, can the claimant perform his or her past relevant work?
5.    Considering the claimant's age, education, past work experience, and residual functional capacity, can the claimant perform other work available in the national economy?

*See* 20 C.F.R. §404.1520(a)(4); *see also Henley v. Astrue*, 573 F.3d 263, 264 (6th Cir. 2009); *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

At Step 2, the ALJ found that Plaintiff has the severe impairments of status post anterior cervical discectomy (June 2010), affective disorder, and anxiety disorder.  R. at 13.

At Step 3, the ALJ found that Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments.  R. at 13-14.

At Step 4, the ALJ found that Plaintiff has the RFC to perform light work with the following limitations:  lift no more than 10 pounds frequently and 20 pounds occasionally; sit for no more than 6 hours of an 8-hour workday; stand and/or walk for no more than 6 hours of an 8-hour workday; occasionally handle with her right upper extremity; occasionally climb, balance, stoop, kneel, crouch, or crawl; occasional, brief contact with the public; tasks with 1 or 2 step instructions; cannot require prolonged periods of sustained concentration; and unskilled work.  R. at 14-18.  Moreover, the ALJ found that Plaintiff is unable to perform any past relevant work.  R. at 18-19.

At Step 5, having considered Plaintiff's age, education, work experience, and RFC, the ALJ found that there are jobs that exist in significant numbers in the national economy that Plaintiff can perform.  R. at 19-20.

**E.  Standard of Review**

The District Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g).  When reviewing a case under the Social Security Act, the Court "must affirm the Commissioner's decision if it 'is supported by substantial evidence and was made pursuant to proper legal standards.'"  *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. at 2009) (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. at 2007)); *see also* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . .").  Under this standard, "substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Rogers*, 486 F.3d at 241 (quoting *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).  In deciding whether substantial evidence supports the ALJ's decision, the court does "not try the case *de novo*, resolve conflicts in evidence or decide questions of credibility."  *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant.").

Although the substantial evidence standard is deferential, it is not trivial. The Court must "'take into account whatever in the record fairly detracts from [the] weight'" of the Commissioner's decision.  *TNS, Inc. v. NLRB*, 296 F.3d 384,

395 (6th Cir. 2002) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)).  Nevertheless, "if substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'" *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)). Finally, even if the ALJ's decision meets the substantial evidence standard, "'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'"  *Rabbers*, 582 F.3d at 651 (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007)).

F.    **Analysis**

In her motion for summary judgment, as well as her answer to Defendant's dispositive motion, Plaintiff sets forth three statements of error:  (1) the ALJ failed to accord controlling weight to the opinions of Plaintiff's treating surgeon, Dr. Junn, as to functional limitations required by his patient, contrary to the terms of the treating physician rule; (2) the ALJ's finding that post-surgical images revealed only "mild abnormalities" is not supported by substantial evidence, further undercutting his findings as to the severity of Plaintiff's condition; and (3) the ALJ additionally failed to adequately account for plaintiff's non-exertional limitations in setting forth the RFC.  DE 11 at 13-19, DE 14 at 4-8.

The Commissioner opposes Plaintiff's motion, asserting that: (1) substantial evidence supports the ALJ's assignment of weight to the opinion of Plaintiff's treating surgeon; (2) substantial evidence supports the ALJ's evaluation of the record medical imaging; and (3) Plaintiff fails to demonstrate that the ALJ omitted any significant non-exertional limitations from his RFC finding or his corresponding hypothetical to the VE. DE 13 at 17-29.

The Undersigned will address each argument raised in turn.

### 1. Substantial Evidence Supports the ALJ's Weighing of Opinion Evidence.

The ALJ must consider all medical opinions that he or she receives in evaluating a claimant's case. 20 C.F.R. § 416.927(d). The regulations define medical opinions as "statements from physicians . . . that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions." 20 C.F.R. § 416.927(a)(2). "Administrative law judges are not bound by any findings made by State agency medical or psychological consultants, or other program physicians or psychologists." 20 CFR § 404.1527(e)(2)(i). The ALJ must, however, "consider findings and other opinions" of State Agency medical or psychological consultants.

The ALJ generally gives deference to the opinions of a treating source "since these are likely to be the medical professionals most able to provide a

detailed, longitudinal picture of [a patient's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone . . . ."  20 C.F.R. § 416.927(d)(2); *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 408 (6th Cir. 2009).  To qualify as a treating source, the physician must have an "ongoing treatment relationship" with the claimant.  20 C.F.R. § 404.1502.

    If the ALJ does not afford controlling weight to a treating physician's opinion, the ALJ must meet certain procedural requirements.  *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). [10]  Specifically, if an ALJ does not give a treating source's opinion controlling weight:

> [A]n ALJ must apply certain factors—namely, the length of the
> treatment relationship and the frequency of examination, the nature
> and extent of the treatment relationship, supportability of the opinion,
> consistency of the opinion with the record as a whole, and the

---

[10] An exception exists for treating source opinions on issues that are reserved to the Commissioner, which "are never entitled to controlling weight or special significance."  S.S.R. 96-5p, 61 FR 34471-0, at *34473.  Examples of issues reserved to the Commissioner include:

> 1. Whether an individual's impairment(s) meets or is equivalent in
> severity to the requirements of any impairment(s) in the listings;
> 2. What an individual's RFC is;
> 3. Whether an individual's RFC prevents him or her from doing past
> relevant work;
> 4. How the vocational factors of age, education, and work experience
> apply; and
> 5. Whether an individual is "disabled" under the Act.

*Id.*

specialization of the treating source—in determining what weight to give the opinion.

*Id.*

Furthermore, an ALJ must "always give good reasons in [the ALJ's] notice of determination or decision for the weight [the ALJ] give[s] your treating source's opinion." 20 C.F.R. § 416.927(d)(2). Accordingly, the ALJ's reasoning "must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Friend v. Comm'r of Soc. Sec.*, No. 09-3889, 2010 WL 1725066, at *7 (6th Cir. 2010) (internal quotation omitted). The United States Court of Appeals for the Sixth Circuit has stressed the importance of the good-reason requirement:

> "The requirement of reason-giving exists, in part, to let claimants understand the disposition of their cases," particularly in situations where a claimant knows that his physician has deemed him disabled and therefore "might be especially bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied." *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir.1999). The requirement also ensures that the ALJ applies the treating physician rule and permits meaningful review of the ALJ's application of the rule. *See Halloran v. Barnhart*, 362 F.3d 28, 32–33 (2d Cir. 2004).

*Wilson*, 378 F.3d at 544–45. Thus, the reason-giving requirement is "particularly important when the treating physician has diagnosed the claimant as disabled." *Germany-Johnson v. Comm'r of Soc. Sec.*, 312 F. A'ppx 771, 777 (6th Cir. 2008) (citing *Rogers*, 486 F.3d at 242).

Among the ALJ's many citations in his Step 4 RFC determination is his discussion of Dr. Junn's November 1, 2012 State of Michigan Family Independence Agency (FIA) Medical Examination Report.  R. at 17, 761-762. After noting Dr. Junn's diagnosis of cervical disc herniation - and the limitations of *lifting no more than 10 pounds occasionally*, standing and/or walking for a total of less than 2 hours in an 8-hour work day, *sitting and standing at will*, and *an inability to repetitively use either upper extremity for simple grasping or fine manipulation*, while further noting Dr. Junn's assessment that Plaintiff can meet her needs in the home - the ALJ stated:

> Weight is given to this opinion.  *Dr. Junn's treatment records do not reflect any problems with Claimant's left upper extremity*.  However, his opinion that Claimant has *some difficulty* standing or walking for prolonged periods is consistent with the [RFC] and Claimant's testimony.  The opinion that Claimant can meet her needs in her home is consistent with Claimant's statements that she is able to prepare simple meals, do light housekeeping, and care for her children.

R. at 17 (emphasis added).  Ultimately, the ALJ found that Plaintiff has the RFC to perform light work with the following limitations:  *lift no more than 10 pounds frequently and 20 pounds occasionally*; *sit for no more than 6 hours of an 8-hour workday*; stand and/or walk for no more than 6 hours of an 8-hour workday; *occasionally handle with her right upper extremity*; occasionally climb, balance, stoop, kneel, crouch, or crawl; occasional, brief contact with the public; tasks with

1 or 2 step instructions; cannot require prolonged periods of sustained concentration; and unskilled work.  R. at 14-18.

In the motion at bar, Plaintiff argues that the ALJ did not comply with 20 C.F.R. §§ 404.1527, 416.927 in his treatment of the functional limitations imposed by Dr. Junn.  DE 11 at 14.  In particular, after referring to the above-quoted portion of the ALJ's Step 4 RFC determination, Plaintiff notes that the ALJ later stated: "*None of Claimant's treating sources have opined that her pain prevents her from working.  It does not appear that any functional or work limitations were discussed at any of Claimant's office visits*."  R. at 18 (emphasis added).  It is Plaintiff's position that ALJ Perez's opinion contradicts itself as to limitations and that the RFC does not address some of the limitations the ALJ acknowledged.

To be sure, the Undersigned acknowledges that there are differences between Dr. Junn's November 1, 2012 assessment of functional limitations and the functional limitations set forth in Plaintiff's RFC.  R. at 14, 761-762.  Moreover, considering that the November 8, 2011 physical RFC assessment was signed by a single decision maker (SDM), Dr. Junn's opinion November 1, 2012 opinion may well be, as Plaintiff asserts, "the only opinion of record as to [P]laintiff's RFC." DE 11 at 16, R. at 75-76, 761-762.

However, the Court should conclude that the ALJ did provide "good reasons" for rejecting certain functional limitations assessed by Dr. Junn:

### a.    Repetitive Action with Hands/Arms

The ALJ acknowledged Dr. Junn's November 1, 2012 assessment.  Dr. Junn had noted that Plaintiff could not use either upper extremity for simple grasping or fine manipulating, but could use both hands and arms for reaching, pushing and pulling.  (R. at 762).  The ALJ observed that Dr. Junn's treatment records did not reflect any problems with Plaintiff's left upper extremity.  R. at 17.  The resulting RFC contains the limitation that Plaintiff "can only occasionally handle with her right upper extremity[,]" which seems to accredit Dr. Junn's assessment.  R. at 14.

### b.    Standing/Walking and Sitting

Dr. Junn also assessed Plaintiff (by form checklist) as being able to stand and/or walk with normal breaks[11] for a total of less than 2 hours in an 8-hour work day, including a handwritten notation which reads, "sit and stand at will[.]"  R. at 762.  Here, the ALJ recognized that Plaintiff had "some difficulty" with standing or walking for prolonged periods and found this consistent with the RFC and Plaintiff's testimony.  R. at 17.  The corresponding limitation in the RFC is that Plaintiff may stand and/or walk for no more than six hours of an eight-hour workday.  R. at 14.

---

[11] In her motion, the Commissioner refers to the Program Operations Manual System (POMS): ″Consider an 8-hour workday and a 5 day work week (with normal breaks, e.g., lunch, morning and afternoon breaks) in evaluating the ability to sustain work-related functions."  POMS, § DI 24510.005(C)(2)(b), https://secure.ssa.gov/apps10/poms.nsf/lnx/0424510005; *see also*, DE 13 at 19, 27.

The RFC does not address Dr. Junn's assessment that Plaintiff should have a sit and stand at will option (R. at 762). However, any omission in this regard is harmless. At the hearing, the ALJ posed a second hypothetical in which the VE was asked to treat Plaintiff's testimony as credible and take into consideration exertional impairments. Here, the VE testified that such conditions would preclude light jobs but would permit sedentary mobs with a sit/stand option, such as: a sedentary inspector, for which there were 3,500 in the Detroit area; a surveillance system monitor, for which there were 800 in the Detroit area; and a table worker, for which there were 3,000 in the Detroit area. R. at 44-45. Therefore, the Commissioner is correct that, even if the ALJ had credited Dr. Junn's sit/stand option, the ALJ would still have concluded that Plaintiff was capable of performing other work. DE 13 at 19-20 n.4.

### c.    Lifting/Carrying

Dr. Junn also limited Plaintiff to occasionally lifting/carrying 10 pounds or less and never lifting/carrying 20-50 pounds or more. R. at 762. At the January 22, 2013 hearing, Plaintiff testified that she could lift and carry about a half gallon. R. at 39. As noted earlier, the ALJ's RFC determination included limitations of lifting no more than 10 pounds frequently and 20 pounds occasionally. R. at 14.

Here, too, any inconsistency between Dr. Junn's assessment, Plaintiff's testimony and the ALJ's corresponding RFC limitation is harmless. When the ALJ

posed the second hypothetical, which included Plaintiff's exertional impairments, the VE acknowledged Plaintiff's testimony that "she could only lift a half a gallon, which is, I believe, 64 ounces." R. at 44, 39.  Although this limitation precluded light jobs, it would permit the aforementioned sedentary jobs with a sit/stand option.  R. at 44.  *See* 20 C.F.R. §§ 404.1567(a), 416.967(a).[12]  Therefore, even if the ALJ had credited Dr. Junn's limitation of occasional lifting/carrying 10 pounds or less, the ALJ would still have concluded that Plaintiff was capable of performing other work.

### d.    Plaintiff does not challenge the ALJ's assessment of her credibility.

Moreover, the ALJ was not required to base his decision on Dr. Junn's November 1, 2012 assessment.  "[T]reating source opinions on issues that are reserved to the Commissioner are never entitled to controlling weight or special significance. Giving controlling weight to such opinions would, in effect, confer upon the treating source the authority to make the determination or decision about whether an individual is under a disability, and thus would be an abdication of the Commissioner's statutory responsibility to determine whether an individual is

---

[12] "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met."  20 C.F.R. §§ 404.1567(a), 416.967(a).

disabled."  SSR 96-5p, 1996 WL 374183, 2 (July 2, 1996); *see also, Rudd v. Commissioner of Social Sec.*, 531 F.App'x 719, 728 (6th Cir. 2013).

To be sure, "the ALJ may not substitute his own medical judgment for that of the treating physician where the opinion of the treating physician is supported by the medical evidence." *Meece v. Barnhart*, 192 Fed.Appx. 456, 465 (6th 2006) (citing cases).  Also, "[t]he ALJ must not substitute his own judgment for a doctor's conclusion without relying on other medical evidence or authority in the record."  *Mason v. Commissioner of Social Sec.*, No. 1:07-cv-51, 2008 WL 1733181, 13 (S.D.Ohio Apr. 14, 2008) (Beckwith, C.J. adopting report and recommendation of Hogan, M.J.); *see also*, *White v. Commissioner of Social Sec.*, No. 13-15172, 2015 WL 1510640, 13 (E.D. Mich. Mar. 24, 2015) (Cox, J., accepting and adopting report and recommendation of Hluchaniuk, M.J.) (citing *Mason*).

Here, the ALJ also discounted Plaintiff's credibility.  For example, the ALJ noted Plaintiff's testimony about spending most of the day in bed, compared to her statements about caring for her baby and two school aged stepchildren.  *See* R. at 18, 29, 37-38, 39-40, 226.[13]  Although Plaintiff takes the position that she would not have been found able to work had she been found credible (DE 11 at 12), her

---

[13] Likewise, based upon other information contained in the record, the ALJ could have pointed to the fact that Plaintiff folds laundry, dusts, drives and goes out about four to five times per week. R. at 226-228.

arguments do not challenge the ALJ's assessment of her credibility (DE 11 at 13-19).  *See also, Hogg v. Sullivan*, 987 F.2d 328, 333 (6th Cir. 1993) ("The evidence tends to show that Hogg did not experience marked restrictions in activities in her daily living. She herself stated that she was able to care for herself and her son, and that she was able to maintain an active schedule of daily activities, including attending church and vocational training, visiting relatives, and driving herself."); *Sizemore v. Secretary of Health and Human Services*, 865 F.2d 709, 713 (6th Cir. 1988) ("the appellant's own testimony disclosed that he was able to drive an automobile, shop, do housework, visit relatives regularly and babysit his grandson occasionally, read and view television, feed the chickens daily and garden from time to time.").

Thus, as the Commissioner asserts, the ALJ credited Dr. Junn's opinion to the extent he found it consistent with the record evidence as a whole, and did not afford it controlling weight where he found Plaintiff's corresponding statements about her limitations to be less than fully credible.  DE 13 at 21-22.[14]  It was well

---

[14] In reply, Plaintiff cites *Wyatt v. Commissioner of Social Sec.*, No. 12-11406, 2013 WL 4483074 (E.D. Mich. Aug. 19, 2013) (O'Meara, J., adopting report and recommendation of Randon, M.J.) within her argument that "The ALJ failed to accord controlling weight to the opinions of plaintiff's treating surgeon, Dr. Junn, as to functional limitations required by his patient, contrary to the terms of the treating physician rule."  *See* DE 14 at 5.  In *Wyatt*, the Court noted:  "there are limited occasions when the medical evidence is so clear, and so undisputed, that an ALJ would be justified in drawing functional capacity conclusions from such evidence without the assistance of a medical source.'"  *Wyatt*, 2013 WL 4483074,

within his authority to handle the information in this manner.  *Crum v. Sullivan*,

921 F.2d 642, 645 (6th Cir. 1990).[15]

### 2. Substantial evidence supports the ALJ's discussion of the post-surgical images.

As noted above, Plaintiff's surgery occurred on June 9, 2010.  R. at 274-275.

Among Plaintiff's medical records are post-surgery diagnostic testing, such as:  a

January 17, 2011 MRI of the cervical spine (R. at 505-506); a January 17, 2011

plain film of the cervical spine (R. at 497-498); a January 17, 2011 EMG (R. at

499-500); a June 13, 2011 MRI of the lumbar spine (R. at 495-496); a July 25,

2012 EMG (R. at 728); and an August 20, 2012 CT myelogram cervical S/I (R. at

765).

Within his Step 4 RFC determination, ALJ Perez stated:  "Despite

Claimant's allegations of disabling neck, back, and arm pain, *post-surgical images*

---

*16-*17 (quoting *Mitsoff v. Comm'r of Soc. Sec.,* No. 3:12cv046, 2013 WL 1098188, at *9 (S.D. Ohio March 15, 2013)).  In the instant case, as noted above, the ALJ gave *weight* to Dr. Junn's November 2012 opinion, albeit not *controlling weight* with respect to each functional limitation.  This is not a case in which the ALJ formulated an RFC "without the assistance of a medical source." He in fact utilized the information gained from the medical source, while giving aspects of it appropriate, relative weight in light of the Plaintiff's diminished credibility.

[15] "The ALJ did not ignore Dr. Wiley's (the psychiatrist's) report. He specifically found that the evidence presented by the claimant's treating physician, Dr. Barrowclough, and by Dr. Konrad (a consulting physician) were more consistent with Dr. Hier's (the psychologist's) assessment than with Dr. Wiley's. Further, Dr. Hier performed accepted psychological tests, while Dr. Wiley's opinions were established almost entirely on the basis of the claimant's subjective complaints." *Crum*, 921 F.2d at 645.

24

*show only mild abnormalities*." R. at 18 (emphasis added). In the instant, Plaintiff

challenges this statement by pointing to the July 25, 2012 and August 20, 2012

tests, which Plaintiff claims were consistent with Dr. Junn's November 1, 2012

report. DE 11 at 16-17.

However, the Court should conclude that substantial evidence supports the

ALJ's statement that post-surgical images show only mild abnormalities.[16] The

medical record contains information in support of a range of adjudicative

conclusions. The ALJ did consider the July 25, 2012 EMG, which was consistent

with right C7-C8 radiculopathy, and the August 20, 2012 cervical myelogram,

which revealed "[p]ostsurgical changes with fusion hardware at C5-C6 without CT

evidence of hardware loosening[,]" and "[r]edemonstration of a small central,

posterior disc protrusion at C8-C7 without significant spinal canal stenosis." R. at

16, 728, 763-765.[17] In contrast, the ALJ also considered the June 3, 2010 MRI of

the cervical spine, which revealed "effacement of the thecal sac with *mild*

narrowing of the central spinal canal and *mild to moderate* narrowing of the right

lateral recess[;]" the January 17, 2011 cervical spine MRI, which revealed *mild*

*disc herniation* in the left C7 neural foramen without compromise of the exiting

---

[16] The parties agree that EMGs are not "images." *See* DE 13 at 22-23, DE 14 at 6.

[17] Presumably, it was to the August 20, 2012 cervical myelogram (R at 763-765)that Dr. Junn was referring in his November 1, 2012 assessment, in which he stated: "CT myelogram shows small central disc protrusion @ C6-C7 causing effacement of thecal sac[.]" R. at 761-762.

nerve root; and the June 13, 2011 MRI of the lumbar spine, which revealed "[n]o

MR evidence for focal disc protrusion to suggest disc herniation[,]" and  "*[m]ild*

*disc desiccation* and diffuse disc bulgings at L3-L4 and L4-L5 . . . ."  R. at 16, 322,

505-506, 495-496 (emphasis added); *see also* R. at 338-339.

 Plaintiff replies that the August 20, 2012 myelogram clearly contradicts the

ALJ's January 31, 2013 finding that "post-surgical images show only mild

abnormalities[,]" and undercuts the ALJ's conclusions as to the limitations

necessitated by Ms. Norgren's cervical problems.  DE 14 at 6-7, R. at 18, 763-765.

However, as the Commissioner points out, the January 17, 2011 EMG was normal

(R. at 499-500) and the December 18, 2012 notes of Dr. Junn state his belief that

Plaintiff's arm symptoms were related to thoracic outlet syndrome rather than

cervical radiculopathy (R. at 759-760), a statement upon which the ALJ relied.  *See*

DE 13 at 24, R. at 17.  Thus, the significance of the July 25, 2012 EMG, which

revealed evidence of cervical radiculopathy (R. at 729-730), is questionable.

 In sum, there is ample support in the June 2010 cervical spine MRI (R. at

322, 338-339), the January 2011 cervical spine MRI (R. at 505-506) and the June

2011 lumbar spine MRI (R. at 495-496) for the ALJ's statement that "post-surgical

images show only mild abnormalities[,]" R. at 18.  Plaintiff is just asking the Court

to reassess the weight of the evidence, which it may not do.  *See Haun v.*

*Commissioner of Social Sec.*, 107 F.App'x 462, 465 (6th Cir. 2004) ("We may not

reweigh conflicting evidence on appeal, but instead must affirm Judge Davis's

decision because substantial evidence supports it.").

### 3. Plaintiff has not demonstrated that the ALJ omitted any significant physical or mental limitations from the residual functional capacity (RFC) finding.

Finally, Plaintiff contends that the ALJ failed to adequately account for her

non-exertional limitations in setting forth the RFC. DE 11 at 17-19. Plaintiff's

RFC is "the most [he or she] can still do despite the physical and mental limitations

resulting from [his or] her impairments." *Poe v. Comm'r of Soc. Sec.*, 342 F.

App'x 149, 155 (6th Cir. 2009); *see also* 20 C.F.R. §§ 404.1545(a), 416.945(a).

The determination of Plaintiff's RFC is an issue reserved to the Commissioner and

must be supported by substantial evidence. 20 C.F.R. §§ 404.1527(3), 416.927(e).

"'ALJs must not succumb to the temptation to play doctor and make their own

independent medical findings.'" *Simpson v. Comm'r of Soc. Sec.*, 344 F. App'x

181, 194 (6th Cir. 2009) (quoting *Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir.

1996)).

Pursuant to Social Security Rule 96-8p, the RFC assessment *must* include:

[A] narrative discussion describing how the evidence supports each
conclusion, citing *specific* medical facts (e.g., laboratory findings) and
nonmedical evidence (e.g., daily activities, observations). In
assessing RFC, the adjudicator must discuss the individual's ability to
perform sustained work activities in an ordinary work setting on a
regular and continuing basis (i.e., 8 hours a day, for 5 days a week, or
an equivalent work schedule), and describe the maximum amount of
each work-related activity the individual can perform based on the

evidence available in the case record. ***The adjudicator must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved.***

S.S.R. 96-8p, 1996 WL 374184, at *6-7 (July 2, 1996) (emphasis added).

During the hearing, ALJ Perez questioned the VE about Plaintiff's non-exertional limitations, and VE Topcik testified: "The non-exertional limitations would be things such as her problems ***concentrating***, the ***headaches*** which cause her to have to lay down two hours at a time or a whole day, her ***crying spells***, ***depression***, any of these things which would cause her to be off-task would preclude the ability to perform any jobs at all." R. at 45 (emphasis added).

### a.    The Non-Exertional Limitations in the RFC are supported by substantial evidence.

As noted earlier, ALJ Perez's Step 4 RFC determination included limitations for ***occasional, brief contact with the public***; ***tasks with one or two-step instructions***; and ***no requirement for prolonged periods of sustained concentration***. R. at 14. In arriving at his RFC determination, the ALJ considered several records, such as:

- May 9, 2009 screening assessment from Hegira Programs, Inc. Psychiatric Intervention Center, which indicated suicidal ideation and showed a primary diagnosis of bipolar affective disorder depressed type and a GAF score of 15 (R. at 258, 261);

- January 25, 2011 notes of Jessica Haveman, M.D. of Oakwood Westland, which acknowledged "possible [postpartum], depression[,]" and assessed Plaintiff with "mood disorder," (R. at 593);

28

- February 8, 2011 notes of Ms. Rickman, which listed a
  diagnosis of bipolar disorder and a GAF assessment of 53 (R. at
  419);

- November 29, 2011 notes of a therapist Betty Rickman from
  Life Practice, L.L.C., which listed a diagnosis of bipolar
  affective disorder and a GAF score of 55 (R. at 686); and

- November 29, 2011 through October 29, 2012 attendance log of
  Life Practice, L.L.C. (R. at 757-758).

*See* R. at 17-18.[18]  Moreover, the ALJ assigned *some weight* to the November 9,

2011 mental RFC assessment of non-treating, non-examining Leonard C. Balunas,

Ph.D.  R. at 18.  As to sustained concentration and persistence, Dr. Balunas opined

that Plaintiff "can carry out tasks that have one and two step instructions and do

not require prolonged periods of sustained concentration[,]" (R. at 63-65).

---

[18] The GAF scale was used to report a clinician's judgment of an individual's
overall level of functioning.  Clinicians selected a specific GAF score within the
ten-point range by evaluating whether the individual was functioning at the higher
or lower end of the range.  *See* American Psychiatric Ass'n, Diagnostic and
Statistical Manual of Mental Disorders 33–34 (American Psychiatric Association,
4th ed. text rev. 2000) (DSM-IV-TR). A GAF score of 20 indicated some danger of
hurting self or others, or occasionally failing to maintain minimal personal
hygiene, or gross impairment in communication.  DSM-IV-TR at 34.  A GAF
score of 41-50 was indicative of serious symptoms (e.g., suicidal ideation, severe
obsession rituals, frequent shoplifting) or any serious impairment in social,
occupational, or school functioning (e.g., no friends, unable to keep a job).  DSM-
IV-TR at 34.  However, "the most recent version of the DSM does not include a
GAF rating for assessment of mental disorders."  *Bryce v. Comm'r of Soc. Sec.*, No.
12-CV-14618, 2014 WL 1328277, at *10 (E.D. Mich. Mar. 28, 2014).

Furthermore, although Plaintiff was assessed nearly four years before the hearing date with a GAF score of 15 (on May 9, 2009)she was later assessed with a GAF score of 53 on February 8, 2011 and a GAF score of 55 on November 29, 2011, and the ALJ took these scores into consideration.  R. at 18, 261, 419, 686. GAF scores in the mid-50s do not preclude a conclusion that Plaintiff has the mental capacity to hold at least some jobs.  *Smith v. Commissioner of Social Sec.*, 482 F.3d 873, 877 (6th Cir. 2007) ("Even assuming GAF scores are determinative, the record supports a GAF in the high 40s to mid 50s, which would not preclude her from having the mental capacity to hold at least some jobs in the national economy.").

> **b.** **Plaintiff has not successfully challenged the ALJ's non-exertional limitations.**

Plaintiff hypothesizes that the diagnosis of bipolar disorder "would provide for crying spells, depression, and problems concentrating . . . ."  DE 11 at 17-18. Also, Plaintiff takes issue with the VE's testimony in response to the first hypothetical, which included the limitation of not requiring prolonged periods of sustained concentration and yielded work as a night patrol inspector, an inspector and a sorter (*see* R. at 43-44), compared to the VE's later testimony in response to the third hypothetical that Plaintiff's non-exertional limitations, among which were concentration problems, would preclude the ability to perform any jobs (*see* R. at 45).  DE 11 at 17.  Furthermore, Plaintiff takes issue with the ALJ's assignment of

"some weight" to the opinion of non-treating, non-examining Dr. Balunas, while the ALJ failed to indicate the weight assigned to the other treating mental health records, especially considering that Dr. Balunas's November 9, 2011 assessment took place 14-15 months before the January 22, 2013 hearing.  DE 11 at 17-18, R. at 60-61, 63-65.

However, Plaintiff has not successfully challenged the ALJ's RFC non-exertional limitations.  At the time of Dr. Balunas's November 9, 2011 assessment, he had before him, *inter alia,* records from:

- Hope Network Insight, presumably Ex. 5F (R. at 415-424);
- Oakwood Hospital-Westland;
- Wayne State University Physician Group;
- Oakwood Annapolis of Wayne, presumably Ex. 3F (R. at 280-342);
- Oakwood Hospital Medical Center, presumably Ex. 4F (R. at 343-414);
- Thermatrix, presumably Ex. 9F (R. at 655-668);
- Lucia Zamorano, M.D., presumably Ex. 7F (R. at 456-510);
- Psychiatric Intervention Center, presumably Ex. 1F (R. at 252-270);
- Team Mental Health, presumably Ex. 10F (R. at 669-670);
- Plymouth Physical Therapy Specialist, presumably Ex. 6F (R. at 425-455); and
- Oakwood Brain & Spine, presumably Ex. 2F (R. at 271-279)

*See* R. at 56-58, 69-71.  Here, Plaintiff's argument about Dr. Balunas lacking the complete medical record "does not identify anything in [the] subsequent records that could reasonably be expected to have altered Dr. Balunas' opinion had he had the opportunity to review it."  DE 11 at 18-19, DE 13 at 26.  Plaintiff has

not shown that the omission was harmful.  *See Shinseki, Secretary of Veterans Affairs v. Sanders*, 556 U.S. 396, 409 (2009) ("[T]he burden of showing that an error is harmful normally falls upon the party attacking the agency's determination.").  Moreover, the entry of additional medical documentation into the record, without more, does not automatically invalidate the opinions of a reviewing state agency medical expert.  *See Helm v. Commissioner of Social Sec. Admin.*, 405 Fed.Appx. 997, 1002 (6th Cir. 2011) ("the ALJ was not required to give relatively less weight to the agency source opinions simply because they were contrary to the opinion of Dr. Cheng.").I acknowledge Plaintiff's reply that harmless error analysis is not a substitute for articulating why certain pieces of evidence are credited or rejected, which, in turn, permits meaningful appellate review.  DE 14 at 7-8.  "Administrative law judges and the Appeals Council are not bound by findings made by State agency or other program physicians and psychologists, but they may not ignore these opinions and must explain the weight given to the opinions in their decisions."  SSR 96-6p, 1996 WL 374180, 2 (July 2, 1996); *see also*, *Hurst v. Secretary of Health and Human Services*, 753 F.2d 517, 519 (6th Cir. 1985) ("In the absence of an explicit and reasoned rejection of an entire line of evidence, the remaining evidence is "substantial" only when considered in isolation. It is more than merely 'helpful' for the ALJ to articulate reasons ... for crediting or rejecting particular sources of evidence. It is absolutely

essential for meaningful appellate review.") (quoting *Zblewski v. Schweiker,* 732 F.2d 75, 78 (7th Cir.1984)).

Nonetheless, the foregoing discussion of ALJ Perez's January 31, 2013 decision evidences enough articulation to provide meaningful appellate review. *Keeton v. Commissioner of Social Sec.*, 583 F.App'x 515, 531 (6th Cir. 2014) ("Following a partial review of Plaintiff's medical records, Lewis [the non-examining state consulting psychologist] acknowledged Plaintiff's treatment history and reviewed the record to gain an understanding of Plaintiff's ability to perform daily life skills. Her report accurately summarized much of Plaintiff's medical history, and there is no direct evidence in the record that contradicts Lewis' findings. As a result, the ALJ did not err in according substantial weight to Lewis' opinion.").

### c.   Conclusion

As shown above, the ALJ's light work RFC finding included several limitations (R. at 14), and the ALJ's assessment of Plaintiff's non-exertional limitations is supported by substantial evidence.  In the end, it is the claimant's burden to prove his or her RFC.  *See* 20 C.F.R. § 416.912(a);[19] *Foster v. Halter*, 279 F.3d 348, 353 (6th Cir. 2001).  Plaintiff has not satisfied her burden to

---

[19] "In general, you have to prove to us that you are blind or disabled."  20 C.F.R. 416.912(a).

challenge the ALJ's RFC finding.  The ALJ's assessment of Plaintiff's non-exertional RFC limitations - "occasional, brief contact with the public[,]" "tasks with one- or two-step instructions[,]" and "work [that] cannot require prolonged periods of sustained concentration[,]" and "unskilled work[,]" - R. at 14, is supported by the record.  That being the case, it is not this Court's role to reject the ALJ's findings, even if it might have reached a different conclusion had it served as the trier of fact in the first instance.  *Braden v. Secretary of Health & Human Services*, No. 90-3028, 1990 WL 177211, 2 (6th Cir. Nov. 14, 1990) ("If the administrative decision is supported by substantial evidence, it must be affirmed even if the court as trier of fact would have arrived at a different conclusion.") (citing *Elkins v. Secretary of Health and Human Services,* 658 F.2d 437, 439 (6th Cir.1981)).

### G.    Conclusion

In sum, from a review of the record as a whole, the Undersigned concludes that substantial evidence supports the ALJ's decision denying benefits. Accordingly, it is **RECOMMENDED** that the Court **DENY** Plaintiff's motion for summary judgment, **GRANT** Defendant's motion for summary judgment, and **AFFIRM** the Commissioner of Social Security's decision.

### III.    PROCEDURE ON OBJECTIONS

The parties to this action may object to and seek review of this Report and Recommendation, but are required to file any objections within 14 days of service, as provided for in Federal Rule of Civil Procedure 72(b)(2) and Local Rule 72.1(d). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1981). Filing objections that raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 932 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1273 (6th Cir. 1987). Pursuant to Local Rule 72.1(d)(2), any objections must be served on this Magistrate Judge.

Any objections must be labeled as "Objection No. 1," and "Objection No. 2," *etc.* Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," *etc.* If the Court determines that any objections are without merit, it may rule without awaiting the response.

Dated: July 30, 2015   s/Anthony P. Patti
          Anthony P. Patti
          UNITED STATES MAGISTRATE JUDGE


I hereby certify that a copy of the foregoing document was sent to parties of record on July 30, 2015, electronically and/or by U.S. Mail.

          s/Michael Williams
          Case Manager for the
          Honorable Anthony P. Patti